******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

Keller, Prescott and Devlin, Js.

*Syllabus*

The plaintiffs, M and M Co., appealed to the Superior Court from the decision
of the defendant town planning and zoning commission denying their
application for a special permit to construct a crematory on property
owned by M that is located in an industrial park in the town. Prior to
filing their application, the plaintiffs proposed a text amendment to the
town's zoning regulations that would make the operation of a crematory
a specially permitted use in the town's two industrial zones. Following
the commission's approval of the text amendment, the plaintiffs submit-
ted their special permit application and an application to construct
and operate a crematory. Thereafter, the commission adopted a text
amendment filed by the intervening defendant that repealed the prior
text amendment, and, after holding four public hearings, it denied the
plaintiffs' special permit application, determining that the plaintiffs failed
to meet their burden of demonstrating that their application satisfied
certain criteria for special permits set forth in the applicable town zoning
regulation (§ 8.5.E). The Superior Court subsequently dismissed the
plaintiffs' appeal, concluding that there was substantial evidence in the
record to support the commission's denial of the plaintiffs' application,
and the plaintiffs, on the granting of certification, appealed to this
court. *Held*:

1. The plaintiffs could not prevail on their claim that the Superior Court
   improperly concluded that there was substantial evidence in the record
   to support the commission's denial of their application for a special
   permit, as there was substantial evidence in the record from which the
   commission reasonably could have determined that the plaintiffs failed
   to meet their burden of demonstrating that their application satisfied
   the general standards set forth in §§ 8.5.E.3 and 8.5.E.4 of the zoning
   regulations: on the basis of the testimony and the evidence in the record,
   the commission reasonably could have concluded that, by allowing the
   plaintiffs to operate a crematory at the location they proposed, the
   development of the industrial park and surrounding area and the welfare
   of the town would be adversely affected in that businesses and individu-
   als would be less inclined to either remain in or to purchase property
   in and around the industrial park and property values in the industrial
   park and surrounding area would be depressed; moreover, contrary to
   the plaintiffs' claim, the Superior Court properly relied on *St. Joseph's
   High School, Inc.* v. *Planning & Zoning Commission* (176 Conn. App.
   570) in dismissing the plaintiffs' appeal.

2. The plaintiffs' claim that the commission improperly failed to consider
   their application for a special permit on the merits because of its predis-
   position to keep a crematory from being located in the industrial park
   and its conviction that it made a legislative misjudgment in adopting
   their proposed text amendment was unavailing: contrary to the plaintiffs'
   assertion that the commission's reasons for denying their application
   were insufficient, the commission authored a detailed resolution of
   denial in which it stated that it denied the plaintiffs' application, in part,
   because it failed to satisfy both § 8.5.E.3 and § 8.5.E.4 of the zoning
   regulations, and this court concluded that the commission's denial of the
   application on the basis of those provisions was supported by substantial
   evidence; moreover, the plaintiffs' reliance on *Marmah, Inc.* v. *Green-
   wich* (176 Conn. 116) in support of their predetermination claim was
   misplaced because, unlike in that case, in which deliberation over the
   plaintiff's site plan application was afforded one public hearing before
   being denied, the plaintiffs' application in the present case was afforded
   attention at four public hearings at which the commission entertained
   an immense amount of evidence and testimony; furthermore, to the
   extent that the plaintiffs challenged the commission's authority to repeal

a text amendment to the zoning regulations despite contrary findings that it made when had it adopted the amendment, that argument was without merit in light of the commission's broad discretion when acting in a legislative capacity.

Argued May 13—officially released September 22, 2020

*Procedural History*

Appeal from the decision of the defendant denying the plaintiffs' application for a special permit, brought to the Superior Court in the judicial district of Danbury and transferred to the judicial district of Hartford, Land Use Litigation Docket, where the court, *Hon. Marshall K. Berger, Jr.*, judge trial referee, granted the motion to intervene as a defendant filed by Connecticut Coining, Inc.; thereafter, the matter was tried to the court, *Hon. Marshall K. Berger, Jr.*, judge trial referee; judgment dismissing the appeal, from which the plaintiffs, on the granting of certification, appealed to this court. *Affirmed.*

*Daniel E. Casagrande*, for the appellants (plaintiffs).

*Charles R. Andres*, for the appellee (defendant).

*Barbara M. Schellenberg*, with whom, on the brief, was *Neil R. Marcus*, for the appellee (intervening defendant).

*Opinion*

PRESCOTT, J. The plaintiffs, B. Shawn McLoughlin and Mono-Crete Step Co. of CT, LLC (Mono-Crete), appeal from the judgment of the Superior Court dismissing their administrative appeal from the decision of the defendant, the Planning and Zoning Commission of the Town of Bethel (commission).[1] In that decision, the commission denied the plaintiffs' application for a special permit (application) to construct a crematory in an industrial park zoning district (industrial zone). On appeal, the plaintiffs claim that the court improperly dismissed their appeal because (1) the commission's denial was not supported by substantial evidence in the record and (2) the commission failed to consider their application on its merits. We disagree and, accordingly, affirm the judgment of the Superior Court.

The following undisputed facts and procedural history are relevant to this appeal.[2] McLoughlin owns property located at 12 Trowbridge Drive (property) in the Clarke Business Park (park) in Bethel. The park is located in one of the town's two industrial zones. Mono-Crete, of which McLoughlin is the sole member, operates a business on the property. Mono-Crete produces precast concrete, which is used to make items such as burial vaults.

Because Mono-Crete's business was declining and the number of cremations in the United States was increasing, McLoughlin decided to seek approval to operate a crematory on the property. In furtherance of that goal, the plaintiffs proposed a text amendment to the Bethel Zoning Regulations (regulations) that would make the operation of a crematory a specially permitted use within either of the two industrial zones in the town. Prior to the commission's voting on the proposed text amendment, the plaintiffs' counsel acknowledged, at two separate meetings of the commission, that the commission's decision on whether to approve the proposed text amendment and any future special permit application seeking site plan approval were mutually exclusive inquiries, each involving unique considerations.[3]

On July 22, 2014, the commission voted to approve the text amendment (July, 2014 text amendment) by a four to three vote. The notice of approval, dated August 5, 2014, stipulated that the commission would allow for the specially permitted use of crematories conditioned on the satisfaction of eight technical requirements.[4] The commission also noted that "the proposed text amendment is . . . a reasonable request . . . in character with the uses in the [i]ndustrial [zone]."

After the commission approved the July, 2014 text amendment, the plaintiffs submitted a special permit application but withdrew it in January, 2015. The plaintiffs then resubmitted their application on February 25, 2015. On May 7, 2015, the plaintiffs submitted to the

commission an application to construct and operate a crematory as required by General Statutes § 19a-320.[5]

Prior to the plaintiffs' resubmission of their special permit application, Connecticut Coining, Inc. (Connecticut Coining), on February 12, 2015, submitted an application for a text amendment to the commission. The proposed amendment would, in effect, repeal the July, 2014 text amendment and impose a one year moratorium on the commission's entertaining applications for and permitting the construction of crematories in the town. At its May 12, 2015 meeting, the commission voted to adopt this amendment (May, 2015 amendment) by a four to three vote. The plaintiffs then appealed the commission's adoption of the May, 2015 amendment to the Superior Court.

On June 17, 2015, Connecticut Coining filed an application for a new text amendment that purportedly sought to correct a procedural defect noted by the plaintiffs in their appeal of the May, 2015 text amendment (revised repeal amendment). The commission, at its September 22, 2015 meeting, voted to adopt the revised repeal amendment by the same margin that it voted to adopt the May, 2015 amendment.[6]

Despite its repeal of the July, 2014 text amendment, the commission, nevertheless, continued to deliberate on the plaintiffs' application.[7] After holding four public hearings on the plaintiffs' application, the commission, at its September 8, 2015 deliberative session, voted to deny it by a four to three vote. Three of the four members who voted to approve the July, 2014 text amendment also voted to approve the plaintiffs' application. Meanwhile, the three members who voted against the July, 2014 text amendment also voted against the plaintiffs' application. The chairperson of the commission, however, voted to approve the July, 2014 text amendment but voted to deny the plaintiffs' application. After voting to deny the plaintiffs' application, the commission, by the same margin, later voted to deny their application to construct and operate a crematory pursuant to § 19a-320.[8]

At its September 22, 2015 meeting, the commission presented its formal resolution of denial of the plaintiffs' application (resolution of denial), in which it set forth its reasoning for denying the plaintiffs' application. The commission generally found that "[t]he [plaintiffs] ha[ve] not demonstrated that the proposed use in the proposed location will not cause harmful health effects to neighboring properties or their occupants and ha[ve] not demonstrated that the use will not cause a loss in value of property or economic development potential. Specifically, the commission stated that the plaintiffs failed to meet their burden of demonstrating that their application satisfied the criteria for special permits set forth in §§ 8.5.E.2,[9] 8.5.E.3,[10] 8.5.E.4,[11] and 8.5.E.5[12] of the regulations. The plaintiffs filed an appeal from that

decision with the Superior Court on October 13, 2015.

The Superior Court heard the plaintiffs' appeal on June 26, 2018. In a memorandum of decision dated October 4, 2018, the court dismissed the plaintiffs' appeal, concluding that there was substantial evidence in the record to support the commission's denial of the application based on the criteria for special permits set forth in §§ 8.5.E.3, 8.5.E.4, and 8.5.E.5 of the regulations.[13]

On November 6, 2016, the plaintiffs filed a petition for certification to appeal pursuant to General Statutes § 8-8 (o) and Practice Book § 81-1. This court granted the plaintiffs' petition on January 16, 2019. Additional facts and procedural history will be set forth as necessary.

Before addressing the plaintiffs' claims on appeal, we first set forth certain legal principles concerning special permits. Our Supreme Court has observed that "[a] special exception allows a property owner to use his property in a manner expressly permitted by the local zoning regulations. . . . Nevertheless, special exceptions, although expressly permitted by local regulations, must satisfy [certain conditions and] standards set forth in the zoning regulations themselves as well as the conditions necessary to protect the public health, safety, convenience and property values [as required by General Statutes § 8-2]. . . . Moreover, we have noted that the nature of special exceptions is such that their precise location and mode of operation must be regulated because of the topography, traffic problems, neighboring uses, etc., of the site. . . . Thus, we have explained that the goal of an application for a special exception is to seek permission to vary the use of a particular piece of property from that for which it is zoned, without offending the uses permitted as of right in the particular zoning district." (Emphasis omitted; internal quotation marks omitted.) *Municipal Funding, LLC* v. *Zoning Board of Appeals*, 270 Conn. 447, 453–54, 853 A.2d 511 (2004).

Moreover, "[§] 8-2 (a) authorizes municipal zoning commissions to enact regulations providing that certain . . . uses of land are permitted only after obtaining a special permit . . . from a zoning commission . . . . [That subsection] further provides that the obtaining [of] a special permit or special exception . . . [is] subject to standards set forth in the regulations and to conditions necessary to protect the public health, safety, convenience and property values. Thus, in accordance with § 8-2 (a), an applicant's obtaining of a special [permit] pursuant to a zoning regulation is subject to a zoning commission's consideration of these general factors. . . . The special [permit] process is discretionary, and the zoning board may base its denial of such an application on general considerations such as public health, safety and welfare, which are enumerated in

zoning regulations . . . ." (Citation omitted; internal quotation marks omitted.) Id., 454–55.

In addition, we are also mindful that our legislature has vested in local governments the authority to determine whether to permit crematories in their towns. See *Urbanowicz* v. *Planning & Zoning Commission*, 87 Conn. App. 277, 295, 865 A.2d 474 (2005). Indeed, this court has stated that "[t]he legislative history of § 19a-320 indicates that local authorities should decide the location of crematories not sited within a cemetery" and that "[t]he location of a crematory is a matter for local zoning approval." Id., 295, 291 n.10. With these principles concerning special permits and local governments' decision-making authority with respect to crematories in mind, we now turn to the plaintiffs' claims on appeal.

I

The plaintiffs first claim that the court improperly concluded that there was substantial evidence in the record to support the commission's denial of their application. We disagree with the plaintiffs and conclude that there was substantial evidence to support the commission's denial based on the general standards set forth in §§ 8.5.E.3 and 8.5.E.4 of the regulations.[14]

We begin by setting forth the legal principles concerning the discretion that planning and zoning commissions are afforded in determining whether to approve an application for a special permit. Our Supreme Court has stated: "Although it is true that the zoning commission does not have discretion to deny a special permit [if] the proposal meets the standards, it does have discretion to determine whether the proposal meets the standards set forth in the regulations. If, during the exercise of its discretion, the zoning commission decides that all of the standards enumerated in the special permit regulations are met, then it can no longer deny the application. The converse is, however, equally true. Thus, the zoning commission can exercise its discretion during the review of the proposed special exception, as it applies the regulations to the specific application before it." (Emphasis omitted.) *Irwin* v. *Planning & Zoning Commission*, 244 Conn. 619, 628, 711 A.2d 675 (1998). In exercising its discretion, a commission's review of a special permit application "is inherently fact-specific, requiring an examination of the particular circumstances of the precise site for which the special permit is sought and the characteristics of the specific neighborhood in which the proposed [use] would be [made]." *Municipal Funding, LLC* v. *Zoning Board of Appeals*, supra, 270 Conn. 457; *St. Joseph's High School, Inc.* v. *Planning & Zoning Commission*, 176 Conn. App. 570, 600, 170 A.3d 73 (2017) (*St. Joseph's*).

Our standard for review of a commission's decision

on an application for a special permit accounts for the significant discretion that a commission is afforded in making such a decision. Indeed, our Supreme Court has stated: "In reviewing a decision of a zoning [commission], a reviewing court is bound by the substantial evidence rule, according to which . . . [c]onclusions reached by [a zoning] commission must be upheld by the trial court if they are reasonably supported by the record. The credibility of the witnesses and the determination of issues of fact are matters solely within the province of the [commission]. . . . The question is not whether the trial court would have reached the same conclusion . . . but whether the record before the [commission] supports the decision reached. . . . If a trial court finds that there is substantial evidence to support a zoning [commission's] findings, it cannot substitute its judgment for that of the [commission]. . . . If there is conflicting evidence in support of the zoning commission's stated rationale, the reviewing court . . . cannot substitute its judgment as to the weight of the evidence for that of the commission. . . . The [commission's] decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given." (Internal quotation marks omitted.) *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, 285 Conn. 381, 427, 941 A.2d 868 (2008). Moreover, "[s]ubstantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred." (Internal quotation marks omitted.) *Sams* v. *Dept. of Environmental Protection*, 308 Conn. 359, 374, 63 A.3d 953 (2013).

The court also has stated that the "substantial evidence standard is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review." (Internal quotation marks omitted.) Id. In light of the significant amount of deference that the substantial evidence standard affords a commission, the court has described it as "an important limitation on the power of the courts to overturn a decision of an administrative agency . . . [that] provide[s] a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action." (Internal quotation marks omitted.) *Property Group, Inc.* v. *Planning & Zoning Commission*, 226 Conn. 684, 697–98, 628 A.2d 1277 (1993).

In sum, "[o]n appeal, judicial review [of a commission's denial of a special permit application] is confined to the question of whether the commission abused its discretion in finding that an applicant failed to demonstrate compliance with the requirements of applicable zoning regulations. *When there is evidence in the record to substantiate the commission's determination, the determination must stand.*" (Emphasis added.) *St. Joseph's*, supra, 176 Conn. App. 606–607.

Turning to the present case, the commission, in denying the plaintiffs' application, relied, in part, on the application's failure to comply with §§ 8.5.E.3 and 8.5.E.4 of the regulations. These provisions set forth general standards that the commission must consider when determining whether to approve a special permit application. Specifically, § 8.5.E.3, which pertains to "[o]verall [n]eighborhood [c]ompatibility," required the commission to evaluate "[w]hether the proposed use will have a detrimental effect on neighboring properties and residences or the development of the district." Section § 8.5.E.4, which pertains to whether the location proposed for the proposed specially permitted use is a suitable location for that use, required the commission to evaluate "[w]hether the location and size of the site, the nature and intensity of the operations involved in or conducted in connection with the use, and the location of the site with respect to streets giving access to it are such that the use will be in harmony with the appropriate and orderly development in the district in which it is located and shall promote the welfare of the [t]own." In sum, both provisions required the commission to consider whether the crematory, based on the location at which it was proposed, would adversely affect the development of the park and surrounding area and promote the welfare of the town.[15]

We note that this court recently held that, "under Connecticut law, a zoning commission may deny a special permit application on the basis of *general standards* set forth in the zoning regulations, *even when all technical requirements of the regulations are met.*" (Emphasis added.) *St. Joseph's*, supra, 176 Conn. App. 594. We also note that it was the plaintiffs' burden to prove to the commission that their application satisfied *both* of these provisions. See *American Institute for Neuro-Integrative Development, Inc.* v. *Town Plan & Zoning Commission*, 189 Conn. App. 332, 340, 207 A.3d 1053 (2019). Thus, if the commission determined that the plaintiffs failed to meet their burden of proving that their application complied with *either* § 8.5.E.3 or § 8.5.E.4, then it could deny their application. See *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, supra, 285 Conn. 427 ("[t]he [commission's] decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given" (internal quotation marks omitted)); *St. Joseph's*, supra, 594 ("commission may deny a special permit application on the basis of *general standards* set forth in the zoning regulations" (emphasis added; internal quotation marks omitted)).

Because the commission did, in fact, deny their application, in part, because it found that it failed to comply with §§ 8.5.E.3 and 8.5.E.4 of the regulations, the plaintiffs, on appeal, had "the burden of proof to show that [the commission's decision] is not supported by the

record." *Unistar Properties, LLC* v. *Conservation & Inland Wetlands Commission*, 293 Conn. 93, 113, 977 A.2d 127 (2009); see also *Verney* v. *Planning & Zoning Board of Appeals*, 151 Conn. 578, 580, 200 A.2d 714 (1964); *St. Joseph's*, supra, 176 Conn. App. 602. To do so, the plaintiffs were required to "do more than simply show that another decision maker, such as the trial court, might have reached a different conclusion. Rather than asking the reviewing court to retry the case de novo . . . the [plaintiffs were required to] establish that substantial evidence does not exist in the record as a whole to support the [commission's] decision." (Internal quotation marks omitted.) *Unistar Properties, LLC* v. *Conservation & Inland Wetlands Commission*, supra, 113.

Related to their claim that there was not substantial evidence in the record to support the commission's denial of their application, the plaintiffs argue that, in dismissing their appeal, the court improperly concluded that it was bound by this court's recent decision in *St. Joseph's*, supra, 176 Conn. App. 570. In support of this argument, the plaintiffs assert that *St. Joseph's* is distinguishable from the present case because "the evidence supporting the special permit denial in that case was fact based and grounded in the firsthand experience of the objecting neighbors." We disagree with the plaintiffs' claim that the court improperly relied on our decision in *St. Joseph's*.

In *St. Joseph's*, this court addressed an apparent conflict in our state's case law concerning whether general standards in the zoning regulations alone could serve as the basis for denying a special permit application. Id., 587–94. In doing so, this court concluded that "[t]here . . . is no doubt that, under Connecticut law, a zoning commission may deny a special permit application on the basis of general standards set forth in the zoning regulations, even when all technical requirements of the regulations are met." Id., 594. The plaintiffs, at oral argument before this court, stated that they do not dispute this conclusion.

Contrary to the plaintiffs' claim, the Superior Court's reliance on *St. Joseph's* was not based on the type of testimony that was offered in that case. Rather, in light of what this court said in *St. Joseph's* about general standards predicating a commission's denial of a special permit application, the court concluded that it was compelled to uphold the commission's denial of the plaintiffs' application because the commission "based [its decision] *upon general standards* concerning the nature of the use, the welfare of the town, and the harmony with other uses and the orderly development in the district." (Emphasis added.) Thus, we conclude that the court properly relied on this court's decision in *St. Joseph's*.

In determining whether there was substantial evi-

dence in the record from which the commission reasonably could have concluded that the plaintiffs' application failed to satisfy §§ 8.5.E.3 and 8.5.E.4 of the regulations, the following additional facts and procedural history are relevant. Prior to the commission's adoption of the July, 2014 text amendment, the town's Economic Development Commission (EDC) provided testimony to the commission in which it voiced its concerns about allowing a crematory to operate in the park. In particular, the EDC stated that, a crematory, if allowed to operate in the park, would have an adverse economic impact on the park and the town.

After the commission adopted the July, 2014 text amendment, the EDC then offered additional testimony that buttressed these concerns. Indeed, in an April 13, 2015 letter to the commission, the EDC restated its "concerns about the negative impact the [proposed crematory] may have on existing properties, businesses, future ownership and the expansion of [the] [p]ark" and noted that "[t]hese were not only the concerns of the EDC, but also business and property owners within [the] [p]ark." In support of its concerns, the EDC pointed out that a person who owned property in the town had decided to sell his properties *after* the commission adopted the July, 2014 text amendment. Indeed, the EDC noted that its "concerns [about the crematory] recently became a reality when a property owner in [the] [p]ark . . . who submitted letters and spoke at the public hearings against this use in the park, put all of his seven Bethel properties (both commercial and residential) on the market. *His decision*, as he stated to the [d]irector of the Office of Economic Development, *was based solely on the* [*July, 2014 text*] *amendment approval.* These properties represent over $41,000 in tax revenue and a loss of over $27,000 a year in potential tax revenue for the expansion he was planning . . . ." (Emphasis added.)

With respect to this property owner's decision to sell his properties, the EDC warned that "this is the first of many potential negative impacts that [allowing a crematory in the park] may have on the [industrial] zone." Moreover, after the July, 2014 text amendment was adopted, another person who owned a business in the park similarly decided to delay making $100,000 worth of improvements to his property and later decided to put his property up for sale.

The EDC then submitted an additional letter on July 13, 2015, in opposition to the plaintiffs' crematory. In light of property owners already putting their properties up for sale after the commission adopted the July, 2014 text amendment, the EDC stated that allowing the plaintiffs to operate a crematory at the proposed location in the park "would negatively impact our ability to sell the additional lots [nearby] for a fair price."

In light of this testimony, the commission, with

respect to § 8.5.E.3 of the regulations, found that "the applicant [failed to demonstrate] that the proposed crematory use [would] not have a detrimental effect on neighboring properties and residences and the development of the [zoning] district." Moreover, the commission found that the application failed to satisfy § 8.5.E.4 because the plaintiffs failed to demonstrate "that the proposed location [was] suitable for the crematory use."

Based on this testimony alone, there was substantial evidence from which the commission reasonably could have concluded that, by allowing the plaintiffs to operate a crematory at the location they proposed, the development of the park and surrounding area as well as the welfare of the town would be adversely affected. In particular, there was substantial evidence from which the commission reasonably could have concluded that, by approving the plaintiffs' application, businesses and individuals would be less inclined to either remain or to purchase property in and around the park. For example, the EDC, in its testimony, pointed to a property owner who *already* had sold his property *after* the commission adopted the July, 2014 text amendment. Based on this testimony and the testimony of another property owner who sold his property in the park after the July, 2004 text amendment was adopted, there was substantial evidence from which the commission reasonably could have concluded that allowing crematories in the park would make property in and around the park less attractive to current and prospective property owners. As a result of this, the town could face difficulty retaining current area businesses and residents and attracting new ones, which would adversely affect the development of the park and surrounding area, as well as the overall welfare of the town.

Moreover, there was substantial evidence from which the commission reasonably could have concluded that approving the plaintiffs' application would depress property values in the park and the surrounding area. First, the EDC noted that it would have difficulty selling new, nearby lots at a *fair price* if the crematory were allowed to operate at the location proposed in the application. In addition, the commission had evidence that two nearby properties had sold after the July, 2014 text amendment was adopted, from which it reasonably could have inferred that property in this area was now less desirable and, as a result, property values would decline. In light of property being less valuable in the park and surrounding area, we conclude that there was substantial evidence from which the commission reasonably could have determined that allowing a crematory to operate at the location proposed by the plaintiffs would negatively impact the development of the park and surrounding area as well as the overall welfare of the town.[16]

Furthermore, even *the plaintiffs'* counsel admitted to the commission that the location that the plaintiffs proposed for the crematory was *not ideal.* Indeed, at an April 14, 2015 meeting before the commission, the plaintiffs' counsel, in response to Connecticut Coining's counsel asking why the plaintiffs did not place the crematory on a different part of the property, stated that the plaintiffs would "love to. . . . This would make this a much simpler application for [them]. As you noted in the site walk, there's a huge hill here. This would be natural screening from everybody. Really, you would have no idea that it was there. Obviously, the 500 foot rule is causing us to not be able to do that.[17] In order to do that, we would have to either change the 500 foot rule in [the statute], which I'm working on but haven't succeeded in doing yet, or the [c]ommission would have to rezone this property . . . which we may come and ask you to do in the future but, for now, we are just proceeding on the assumption that we have to comply with the 500 foot rule." (Footnote added.)

In addition, at a July 15, 2015 meeting of the commission, the plaintiffs' counsel stated that, "[i]n terms of the location on the site, [the plaintiffs'] preference, and [they have] expressed this to you all along, would be to have this down in the existing building or in a small addition to the existing building. [The plaintiffs] think it provides much better screening from the . . . park and is a better location."

Based on the testimony before it, there was substantial evidence from which the commission reasonably could have determined that the plaintiffs failed to meet their burden of demonstrating that their application satisfied §§ 8.5.E.3 and 8.5.E.4 of the regulations. Thus, we conclude that the commission's decision to deny their application was not improper.[18]

II

Even though there was substantial evidence from which the commission reasonably could have concluded that their special permit application did not satisfy §§ 8.5.E.3 and 8.5.E.4 of the regulations, the plaintiffs nevertheless claim that the commission improperly failed to "consider [their] . . . application on its merits . . . ." The plaintiffs argue that, instead, the commission improperly denied their application on the basis of "its predisposition to keep a crematory out of [the park] regardless of whether the . . . application complied with the regulations" and "its conviction that it had made a legislative misjudgment in adopting the [July, 2014] text amendment," which allowed for specially permitted uses of crematories in the town's two industrial zones.

In addressing this claim, we first set forth the relevant legal principles concerning an applicant's claim that a commission denied his or her special permit application

on the basis of a predisposition or predetermination that it held rather than on the application's merits. In addressing this claim, we are mindful that "[t]he law does not require that members of zoning commissions must have no opinion concerning the proper development of their communities. It would be strange, indeed, if this were true. . . . The human mind . . . is no blank piece of paper. . . . Interests, points of view, preferences, are the essence of living. . . . An open mind, in the sense of a mind containing no preconceptions whatever, would be a mind incapable of learning anything, [and] would be that of an utterly emotionless human being . . . ." (Citations omitted; internal quotation marks omitted.) *Cioffoletti* v. *Planning & Zoning Commission*, 209 Conn. 544, 555, 552 A.2d 796 (1989). If, however, "the commission acted with predisposition and predetermination, the commission's actions are capricious, unreasonable and illegal, and cannot be allowed to stand." *Marmah, Inc.* v. *Greenwich*, 176 Conn. 116, 123–24, 405 A.2d 63 (1978).

In addressing this claim, we also are mindful that a claim of predisposition or predetermination is difficult to prove. See R. Fuller, 9B Connecticut Practice Series: Land Use Law and Practice (4th Ed. 2015) § 47:2, p. 35. Indeed, "[w]e presume that administrative [agency] members acting in an adjudicative capacity are not biased." *Simko* v. *Ervin*, 234 Conn. 498, 508, 661 A.2d 1018 (1995). To overcome this presumption and to prove a claim of predetermination, a claimant has the burden of proving that "the commissioners had made up their minds that they were going to disapprove the plaintiffs' plan regardless of any evidence or argument presented at the public hearing." *Daviau* v. *Planning Commission*, 174 Conn. 354, 358, 387 A.2d 562 (1978); see also *Cioffoletti* v. *Planning & Zoning Commission*, supra, 209 Conn. 555 (burden of proving predetermination is on party advancing such claim). To satisfy this burden, a party claiming that a zoning commission denied his or her application on the basis of a predisposition may, pursuant to § 8-8 (k), move to supplement the administrative record in order to proffer evidence to the trial court in support of this claim. See *Marmah, Inc.* v. *Greenwich*, supra, 176 Conn. 121.

Although the plaintiffs raised a claim of predetermination in their Superior Court brief, they did not move to supplement the record to proffer evidence in support of their predetermination claim. Indeed, the only evidence in the record on which the plaintiffs rely relates to the timing of the commission's denial of their application, which closely followed its decision to repeal the July, 2014 text amendment allowing specially permitted uses of crematories in the town's two industrial zones. Specifically, the plaintiffs direct us to remarks made by certain commissioners during deliberative sessions of the commission,[19] as well as "[t]he interplay between the proceedings on the . . . application and the pro-

ceedings to delete the [July, 2014 text amendment] on which [the] application was predicated," "the weakness of the commission's reasons for denying the . . . application," and "the blatant inconsistency between its findings in July, 2014, that a crematory on the property is in character with the uses in the [industrial] zone and its opposite finding a little over a year later." Moreover, the plaintiffs direct our attention to our Supreme Court's decision in *Marmah, Inc.* v. *Greenwich*, supra, 176 Conn. 116, in support of their predetermination claim, even though they acknowledged in their reply brief to the Superior Court that *Marmah, Inc.*, is distinguishable from the present case "in some respects."

After describing the plaintiffs' arguments in support of their predetermination claim in its memorandum of decision, the court implicitly concluded that the commission did not deny their application on the basis of a predisposition that it held.[20] We disagree with the plaintiffs that the commission predetermined the merits of their application.[21]

We first address the plaintiffs' reliance on our Supreme Court's decision in *Marmah, Inc.*, in which it concluded that the Greenwich Planning and Zoning Commission improperly had enacted a "zoning amendment . . . primarily for the purpose of [denying the plaintiff's site plan application, thus] preventing the plaintiff from going forward with its contemplated building project." *Marmah, Inc.* v. *Greenwich*, supra, 176 Conn. 123. In that case, our Supreme Court described "[t]he commission's overt consideration of the site plan [as] casual and perfunctory. The commission appeared to be favoring opponents of the application throughout the public meeting at which it was discussed. Representatives of the [plaintiff] were not permitted to question the representative capacity, or the technical credentials, of those who spoke or wrote in opposition to the application. There was no expert testimony about traffic, architectural design or building design, other than the approvals of [the plaintiff's] application by the defendant town's traffic department, architectural review board, and building department. Nonetheless, the commission voted to disapprove the site plan on the grounds of increased traffic and unsatisfactory parking layout, as well as the absence of a request for new facilities by the postal authorities." (Emphasis omitted.) Id., 118. In support of its conclusion that the "zoning amendment [at issue] was enacted primarily for the purpose of preventing the plaintiff from going forward with its contemplated building project"; id., 123; the court observed that the commission did not provide the plaintiff with a fair hearing on his site plan application and that none of the reasons that the commission provided for denying his site plan application were legitimate. Id., 118–19, 123; see also 9B R. Fuller, supra, § 47.2, p. 37.

Unlike *Marmah, Inc.*, in which deliberation over the plaintiff's site plan application was afforded one public hearing before being denied; *Marmah, Inc.* v. *Greenwich*, supra, 176 Conn. 122–23; the plaintiffs' application in the present case was afforded attention at four public hearings. Moreover, at these hearings and during its deliberative sessions, the commission entertained an immense amount of evidence and testimony.

In addition, contrary to the plaintiffs' assertion that the commission's reasons for denying their application were insufficient, the commission, in fact, authored a detailed resolution of denial in which it stated that it denied the plaintiffs' application, in part, because it did not satisfy §§ 8.5.E.3 and 8.5.E.4 of the regulations. Indeed, in part I of this opinion, we concluded that the commission's denial of the plaintiffs' application on the basis of these provisions in the regulations was supported by substantial evidence.

Furthermore, to the extent that the plaintiffs challenge the commission's authority to repeal a text amendment despite contrary findings that it made when it adopted the amendment, this argument is meritless. Indeed, when a commission adopts or repeals a text amendment to a town's zoning regulations, it acts in its legislative capacity, and, when acting in this capacity, it is afforded immensely broad discretion. See *Morningside Assn.* v. *Planning & Zoning Board*, 162 Conn. 154, 157–58, 292 A.2d 893 (1972). When acting in a legislative capacity, a commission "must be relatively free to amend or modify its regulations whenever time and experience have demonstrated the need for a revision. [A commission], acting in a legislative capacity, [is], therefore, not bound by the general rule which would prohibit it from reversing an earlier decision without evidence of a change in conditions." (Citations omitted.) Id., 158.

Our Supreme Court has stated on many occasions that "courts cannot substitute their judgment for the wide and liberal discretion vested in local zoning authorities when they have acted within their prescribed legislative powers. . . . The courts allow zoning authorities this discretion in determining the public need and the means of meeting it, because the local authority lives close to the circumstances and conditions which create the problem and shape the solution. . . . Courts, therefore, must not disturb the decision of a zoning commission unless the party aggrieved by that decision establishes that the commission acted arbitrarily or illegally." (Citations omitted; internal quotation marks omitted.) *First Hartford Realty Corp.* v. *Planning & Zoning Commission*, 165 Conn. 533, 540–41, 338 A.2d 490 (1973).

In arriving at our conclusion that the commission's denial of the plaintiffs' application was not improper,

we take this occasion to underscore the Superior Court's cogent observation that "[t]his appeal underscores the inevitable tension between a commission's legislative determination leading to the presumptive compatibility of the use . . . and a subsequent administrative determination denying a special permit based upon the use adversely [affecting] the district. . . . The analysis is complicated in the current case by the stigma of the proposed use because it is a cremator[y]." (Citations omitted.) Indeed, a person seeking to operate a crematory on his or her property could, in response to a commission's finding that operating a crematory is "in character" with the uses in a zone in its *legislative capacity*, expend significant resources preparing a special permit application only for the commission subsequently to disallow the crematory when acting in its *administrative capacity*.

The question of regulatory authority for the siting of crematories, however, is an issue for our legislature to resolve. At the present time, our legislature has chosen to vest significant authority in local governments to determine whether to allow crematories in their municipalities. See General Statutes § 19a-320; *Urbanowicz* v. *Planning & Zoning Commission*, supra, 87 Conn. App. 291 n.10, 295. If our legislature determines, as a matter of policy, that there is a significant need for crematories statewide and the local zoning authorities are unduly hampering the ability to meet new demand, then, by statute, it can circumscribe the authority of the local governments and thereby not require those who wish to operate a crematory to seek approval from local planning and zoning commissions. Such a policy determination, however, is ill-suited for resolution in an appeal from a commission's denial of a special permit application.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] On March 9, 2016, Connecticut Coining, Inc., a business located near the proposed crematory, moved to intervene as a defendant in the plaintiffs' appeal pursuant to Practice Book § 9-6 and General Statutes § 8-8 (p). The trial court granted this motion on September 17, 2018. Accordingly, Connecticut Coining, Inc., is a party to this appeal.

[2] At the hearing before the court, the parties stated that they were in agreement as to the facts underlying this appeal.

[3] At the April 22, 2014 meeting of the commission, the plaintiffs' counsel stated that, when considering the proposed text amendment, the commission does not "have the actual proposal in front of [it]; [it doesn't] have the building that's going to be built; [it] can't look at traffic generation; [it] can't look at what screening [the plaintiffs] would be proposing; *all of this can be looked at in detail on a specific site plan special permit application* including the exact make model manufacturer of the equipment that we're proposing to use and what the actual in emissions of that would be." (Emphasis added.) At that same meeting, the plaintiffs' counsel noted that the commission's decision whether to approve the text amendment "is step one, [and] *if the commission sees fit to approve this text amendment,* [*then*] *we still* [*have*] some *hurdles ahead of us*; we [have to] find the right place on our property; we [must] have a good design; [we have] to convince you that the units that we are going to install are going to be satisfactory to meet the air pollution concerns because they are concerns. *Step one is why we're here that's the text amendment* and we're hopeful that you will receive

this favorably." (Emphasis added.)

At the May 27, 2014 meeting of the commission, the plaintiffs' counsel stated: "At the onset I just want to make clear again, which you all know but just to reiterate, that we are applying for a text amendment. *There will be, if you approve this, another process where we have to deal with the specific site in question, site specific issues* such as the operation traffic—visual impairment, issues like that. *We are talking simply about the text amendment which would apply in either business park. . . .* As I noted, *we have to come to you for a* [s]*pecial* [p]*ermit, even if you approve this text amendment.* I think that a lot of the operational issues that people are concerned with *can be dealt with in that process.* Because you'll be dealing with a specific property, you'll know what it's going to look like, where it's going to go, how it's going to work." (Emphasis added.)

[4] The technical requirements for crematories set forth in § 4.3.C.10a of the Bethel Zoning Regulations are as follows: "Crematory facility for the disposal by incineration of the bodies of the dead [shall be permitted], provided:

"a. No such crematory facility shall be located within two (2) miles of any other crematory facility;

"b. Any discharge point from such crematory facility, such as a chimney or smokestack, shall be located at least 1,000 feet from any residence, and shall be screened from view in all directions;

"c. Any [s]tructure containing a retort shall be located at least five hundred feet from any land zoned for residential purposes not owned by the owner of the crematory;

"d. No more than two (2) retorts shall be installed in any such crematory facility;

"e. A dedicated loading space shall be provided which is screened from view from all roadways adjoining the property with a vegetative screen;

"f. The crematory facility shall be located indoors within structures, including any viewing areas;

"g. No funerals or memorial services may be conducted on the premises unless a special permit for a funeral home is issued pursuant to Section 4.3 (C) (10). Use of a viewing area to view the process of incineration shall not constitute a funeral or memorial service; and

"h. The [commission] may, but need not, consider an application for approval of the location of a crematory facility pursuant to [General Statutes] § 19a-320 (b) simultaneously with the required application for special permit."

[5] General Statutes § 19a-320 provides in relevant part: "(a) Any resident of this state, or any corporation formed under the law of this state, may erect, maintain and conduct a crematory in this state and provide the necessary appliances and facilities for the disposal by incineration of the bodies of the dead, in accordance with the provisions of this section. The location of such crematory . . . shall be within the confines of a plot of land approved for the location of a crematory by the selectmen of any town, the mayor and council or board of aldermen of any city and the warden and burgesses of any borough; provided, in any town, city or borough having a zoning commission, such commission shall have the authority to grant such approval. . . .

"(b) Application for such approval shall be made in writing to the local authority specified in subsection (a) of this section . . . ."

[6] The plaintiffs also appealed the commission's decision to adopt the revised repeal amendment. The parties agreed to delay the court's adjudication of the plaintiffs' appeals from the May, 2015 amendment and the revised repeal amendment pending the outcome of the present appeal.

[7] Because the plaintiffs' application was submitted to the commission before the commission repealed the July, 2014 text amendment, the commission was required to consider the application on the basis of the requirements set forth in the July, 2014 text amendment. See General Statutes § 8-2h (a). Section 8-2h (a) provides that "[a]n application filed with a zoning commission, planning and zoning commission, zoning board of appeals or agency exercising zoning authority of a town, city or borough which is in conformance with the applicable zoning regulations as of the time of filing shall not be required to comply with, nor shall it be disapproved for the reason that it does not comply with, any change in the zoning regulations or the boundaries of zoning districts of such town, city or borough taking effect after the filing of such application."

[8] In their appellate brief, the plaintiffs note that "[t]he commission considered the [§ 19a-320] application together with the special permit and site

plan applications." They also assert that, "if they are entitled to a special permit, the § 19a-320 application should be approved as well." Connecticut Coining contests this assertion in its appellate brief. Because we affirm the trial court's judgment with respect to the special permit application, we need not address the § 19a-320 application.

[9] Section 8.5.E.2 of the Bethel Zoning Regulations, which pertains to "[e]nvironmental [p]rotection and [c]onservation," requires the commission to evaluate "[w]hether appropriate consideration has been given to the protection, preservation, and/or enhancement of natural, scenic, historic, and unique resources including, where appropriate, the use of conservation restrictions to protect and permanently preserve natural, scenic, historic, or unique features which enhance the character and environment of the area."

[10] Section 8.5.E.3 of the Bethel Zoning Regulations, which pertains to "[o]verall [n]eighborhood [c]ompatibility," requires the commission to evaluate "[w]hether the proposed use will have a detrimental effect on neighboring properties and residences or the development of the district."

[11] Section 8.5.E.4 of the Bethel Zoning Regulations, which pertains to whether the location proposed for the specially permitted use is a "[s]uitable [l]ocation [f]or [that] [u]se," requires the commission to evaluate "[w]hether the location and size of the site, the nature and intensity of the operations involved in or conducted in connection with the use, and the location of the site with respect to streets giving access to it are such that the use will be in harmony with the appropriate and orderly development in the district in which it is located and shall promote the welfare of the [t]own."

[12] Section 8.5.E.5 of the Bethel Zoning Regulations, which pertains to "[a]ppropriate [i]mprovements," requires the commission to evaluate in relevant part: "a. Whether the design elements of the proposed development will be attractive and suitable in relation to the site characteristics, the style of other buildings in the immediate area, and the existing and probable future character of the neighborhood in which the use is located.

"b. Whether the location, nature and height of buildings, walls, and fences, planned activities and the nature and extent of landscaping on the site will be such that the use shall not hinder or discourage the appropriate development and use of adjacent land and buildings or impair the value thereof."

[13] The court noted, however, that the evidence in support of the commission's denial based on § 8.5.E.2 of the regulations was not substantial. On appeal, the parties do not dispute the trial court's determination that there was not substantial evidence to support the commission's determination that the plaintiffs' application failed to satisfy § 8.5.E.2. Thus, we do not address this issue in this opinion. See *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, 285 Conn. 381, 427, 941 A.2d 868 (2008) ("[t]he [commission's] decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given" (internal quotation marks omitted)).

[14] The plaintiffs also claim that the court improperly concluded that there was substantial evidence to support the commission's denial of their application based on § 8.5.E.5 of the regulations. We need not reach this issue, however, because we conclude that there is substantial evidence in the record to support the denial of the application based on §§ 8.5.E.3 and 8.5.E.4 of regulations. See *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, 285 Conn. 381, 427, 941 A.2d 868 (2008) ("[t]he [commission's] decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given").

[15] With respect to interpreting zoning regulations, our Supreme Court recently stated: "Because the interpretation of the regulations presents a question of law, our review is plenary. . . . [Z]oning regulations are local legislative enactments . . . and, therefore, their interpretation is governed by the same principles that apply to the construction of statutes. . . . Moreover, regulations must be interpreted in accordance with the principle that a reasonable and rational result was intended . . . . The process of statutory interpretation involves the determination of the meaning of the statutory language [or . . . the relevant zoning regulation] as applied to the facts of the case, including the question of whether the language does so apply." (Internal quotation marks omitted.) *Lime Rock Park, LLC* v. *Planning & Zoning Commission*,    Conn.    ,    ,    A.3d    , (2020).

[16] With respect to property values in the surrounding area, the commission discredited "an opinion by a real estate agent that there would be negligible effects on the value of property in the [industrial] [z]one and nearby residential properties" and noted that "[t]he [plaintiffs] did not submit any studies

from an appraiser on this issue." We note that determining "[t]he credibility of the witnesses . . . [is] solely within the province of the [commission]." (Internal quotation marks omitted.) *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, supra, 285 Conn. 427.

[17] General Statutes § 8-2n provides in relevant part: "The zoning regulations adopted under section 8-2 or any special act shall not authorize the location of a crematory within five hundred feet of any residential structure or land zoned for residential purposes not owned by the owner of the crematory. . . ."

[18] The plaintiffs also claim that the commission deprived them of their rights to due process and fundamental fairness because it "reli[ed] on the purported visibility of the crematory stacks" in denying their application, even though it declined the plaintiffs' invitation to "shoot a sight line measurement in all directions to determine if the stacks actually would be visible to the neighboring property owners, *if the commission felt this was necessary*." (Emphasis added.) We need not address this claim, however, because we conclude, for reasons other than the purported visibility of the crematory stacks, that there was substantial evidence in the record to support the commission's denial of the plaintiffs' application. See *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, supra, 285 Conn. 427 ("[t]he [commission's] decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given" (internal quotation marks omitted)).

[19] In support of this argument, the plaintiffs generally direct us to "the remarks of the chair[person] during the deliberative sessions on the . . . application held on August 11, 2015 and September 8, 2015." Specifically, they direct us to the statements made by the chairperson and some commissioners during the September 8, 2015 session. During this session, the chairperson stated: "I think what we've been hearing—this most recent go around with this application is that not only are the neighbors concerned but the businesses in the [p]ark are concerned. And, we've had a lot information pro and con but, it's very difficult to separate that which is fact from that which is not because pretty much you could find anything on the Internet to support what your beliefs might be. And, is it going to be compatible with other businesses in the park? I don't believe it is—based on the feedback that you've had from businesses, who say they may leave the park. And, based on [a business owner's] purchase of his building at 1.2 million dollars, unfortunately not being told about the application, and who's made the decision that he is going to sell his business—his building. That's a great concern and I think a number of them have pulled back on expansions and we have to—I feel that we have to take a look and say, 'is it worth the risk to lose businesses in the park?' And, the number that said they may leave because for me that's a huge economic drawback not only to Bethel but to the [p]ark and for that reason, I don't think it works and is compatible."

Following the chairperson's remarks, one commissioner opined that, by approving the application, the commission "would be doing the citizens of Bethel a disservice [by] tak[ing] [the] risk" of "possible adverse" impacts to business and residents caused by a crematory being located at the proposed site within the park. Another commissioner then pointed out that "there was just an abundance of material [presented to the commission when it considered the [application] and frankly none of [it] was available— I'm sure it was available but none of it was in front of us when we originally gave a decision to pass the [July, 2014] text amendment. None of the information was, (indiscernible), we did the best job that we could based on the information that we had at that time but, now I believe it's different, it's changed." Following this statement, another commissioner acknowledged that "we all were more or less in the same corners we are now," referencing the fact that, with the exception of the chairperson, the commissioners who voted to approve the July, 2014 text amendment also voted to approve the application, and the three commissioners who voted against the July, 2014 text amendment supported denial of the application.

[20] To the extent the trial court's decision on this claim was ambiguous, the plaintiffs failed to move for an articulation pursuant to Practice Book § 66-5 to clarify its conclusion. This court has stated: "[I]t is axiomatic that the appellant must provide this court with an adequate record for review. . . . It is well established that [a]n articulation is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification. . . . [P]roper utilization of the motion for articulation serves to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision, thereby sharpening

the issues on appeal." (Citations omitted; internal quotation marks omitted.) *Breen* v. *Judge*, 124 Conn. App. 147, 161, 4 A.3d 326 (2010).

[21] Because the plaintiffs failed to supplement the record with evidence supporting their claim of predetermination and the Superior Court did not make any findings with respect to this claim, our consideration of this claim on appeal is limited to the arguments and evidence that they presented to the Superior Court.

―――――――――――――――――